Mr. Stoniker, would you like to make a rebuttal argument? Please stop short of using all the time up. Yes, sir. I even have a couple of reminders here. Thank you. In the police court, I represent Steve Killingstad, and he was arrested and indicted for violating a custodial interference statute that, indeed, he did not violate. The question then went through. Well, the criminal case was tossed by the same judge, incidentally, that signed the dissolution decree, and ultimately we ended up in trial in which a jury in Prescott, Arizona, in the district court up there, entered verdicts in his favor as to all arrest-related and indictment-related torts, both civil rights and state law torts. Then Judge Strand set aside all the arrest-related state law torts, finding lack of probable cause as a matter of law. Finding lack of probable cause? Yes. I'm sorry. On the absence of probable cause. No. On the existence of probable cause as a matter of law. Sorry. That sounds more like it. No, that's the other. Otherwise, I win. Yeah, exactly. Now, the question is whether there existed substantial evidence to support those verdicts. That is only relevant evidence that reasonable minds might, and of course here did, accept as adequate to support a conclusion, both on the state law torts and on the civil rights claim. Counsel, may I ask you a question? It appears that Judge Strand put great weight on whether or not the officers knew about the existence of the divorce, the actual divorce decree. Would you agree with that? I think he put too much on it. Right. So what significance was that? I just, I couldn't. He asked the jury specifically whether or not the jury found that the officers were aware of the existence of the, what I call the final divorce decree. Right. And of course for application of joint legal custody under the offense of arrest and of indictment 13-1302A3, you had to have the existence of joint legal custody, which can only come in through a final decree. That's why it became an important issue, particularly since it had been signed that Friday, August 4th, 2000, but not filed until the following Monday. It was signed right at the end of the day. Okay. Let me just ask you this so I can follow through on trying to understand the significance. So the jury said no, that the officers were not aware of the existence. So what does that mean then for purposes? Why then would Judge Strand think that there was probable cause if the jury made the ruling that the officers were not aware of the final decree? Well, all I can figure, I mean, because he didn't say it in his order and we didn't get it in oral argument. Counsel for the defendants argued that there was some other then closely related offense, but of course under Devin Peck it could be anything that they knew about, that officers knew about at the time and could have arrested and indicted him for. But I don't see why that was much of a difference, particularly in light of the Byers v. Lewiston decision here relating to police officers' failure to read the terms of a particularized order and be acquainted with it. The question, though, is whether substantial evidence as to the entry and arrest existed. Substantial evidence that it was unsupported by any legal or factual basis, and the jury ruled in our favor. The same thing with the question of whether the indictment for 1302A3 requiring joint legal custody. In fact, the judge left the indictment-related state torts intact. Now, it appears, and I guess the only claim relating to that jury question, would be whether 1302A3 should have been applied at all. And I think that the jury question says, no, police didn't know about it. There was no basis for arresting him for violating a joint legal custody order. So then we're left with whether or not there was probable cause to arrest him for violation of the temporary order. Well, right. And under what theory? Right. That's right. And, of course, what we know is with the temporary order, and, you know, any of the 131302 is the only statute that the other side has ever said might apply. So you can go through. There are, I think, and that's at my EOR at 40. We have four different subsections. One doesn't apply because it requires joint legal custody that the judge treated, and I think we all agree, didn't apply to these facts. So we have A1 entices or keeps from lawful custody any child. That may apply because we had a temporary custody order granting temporary custodial access. A2 says before entry of a court order determining custodial rights, depending on how you read the nature of the T.O. That's right. Then A3 doesn't apply, and A4 is outside of the state access rights. So we still go back to, A, did my client, well, did the police have any probable cause to believe that my client had a culpable specific intent? Namely, that he knew that he was violating, that he, well, that he knew he had or reason to know that he had no legal right to withhold the child. And, of course, we know that with that temporary order, no communication was to go on between Steve Killingstad and his soon-to-be ex-wife, Susan. All communication through court liaison Del Killingstad. All visitation, or actually they called it custody scheduling issues through Del Killingstad, the court-ordered liaison. No officer read paragraph 5 designating Del Killingstad as the person for visitation and custody scheduling issues. No one read paragraph 1 designating him liaison in the first place. The only thing that anybody claimed to have read was paragraph 3, which listed the times for the exchanges to take place. Let me ask a question. When the arrest was made, did the arresting officers know that Del Killingstad had brought, as I understand it, brought the kid to the marshal's office earlier that day? Well, the testimony at trial was that Steve Killingstad brought the child up to the marshal's office and that Del was across the street from the marshal's office and saw that also. And that's uncontradicted. But did the police have, did the arresting officers have knowledge that the child was brought to the marshal's office that day? At trial, they claimed not to, to have had no. But they didn't keep watch. Let's assume they didn't know, the ones who made the arrest, that Mrs. Killingstad or the former Mrs. Killingstad goes in at 7 p.m., says, I don't have the kid, the time's changed, I complained last week. And some officers there on duty then assume they didn't know what happened at 4. And they go out and arrest your client. Well, that's exactly what they claim here. So are they on constructive notice of whatever notice was given to other police officers? No. No other police officers knew that Steve took Davin up to Camp Bertie Marshall's office that afternoon. They didn't know that until they arrived at his house to take the child from him. The reason they told that then? My client says he told them that. Well, that's a factual dispute. The jury was all in your favor. Of us, yes. Right. The odd thing about this is that I think the way one reads it, I mean, since Susan wasn't there for the exchange, she could have complained if my guy hadn't been there with the child at the exchange time. She wasn't there. And she didn't show up for greater than two hours later, which the Avapi County guidelines for visitation and custody give a two-hour window. So it's more generous than saying you show up at 4. She didn't show up for three hours. Was it your client's or his father's testimony that they were outside the office, the Marshall's office, but because Susan didn't show up, they never went inside? In other words, there's no evidence that the police inside knew of an attack. They never went inside to do the exchange. They only – it was like a neutral place. It was the same as when you have these handovers at McDonald's or something. I mean, it's the same. They just – that's a place out in public where, you know, presumably the adults would act appropriately. So that's – so if we look at Devenpeck, which said that you can go to other offenses that the police knew about, I mean, they still have to be objectively reasonable in their assessment, we can look at these other offenses. But in light best for Killingstead, he didn't violate anything. I mean, even the Camp Verde so-called experts said he didn't violate the decree because he had primary physical custody. And since he had done what he was ordered to do by appearing at four, and she had not done what she was ordered to do and had come after three hours, he had every right to hang on to the kid. And that's a reasonable thing. You don't want these children being tossed about as pawns in a match. And if a child is going to be upset because mom didn't come pick them up, well, at some point you're going to be able to calm them down and get things moving, which is what happened here. A couple other kids and Davin were eating pizza. Everybody's playing around in the yard when the cops roll up three hours later. So I think that we've handled that. If we look at qualified immunity, the burden was on Camp Verde to establish objectively reasonable officers would believe they were not violating Steve Killingstad's constitutional rights in light of settled law. Now, we know you can't enter premises without a search warrant unless you have exigent circumstances. You can't arrest without probable cause. You can't indict without probable cause. And you surely can't have an indictment that's based on false and misleading testimony. And that's everything that we have here. Did the state law that existed on August 4th give the officers fair warning that their actions were unconstitutional? Byers says yes. Camp Verde officers did even less than the officers did in Byers. They did not confirm the existence of an order. Nobody did. They had a week from when Susan began her most recent complaints. The reason that's really important, factually speaking, is that a year before, Susan had pulled a similar thing where she goes to the police saying, my husband violated protective order XYZ. On his own initiative, not because of training or supervision, Officer Huff called the clerk at the Superior Court subdivision that's only five or six miles away from the marshal's office, said, hey, is this order in this case number still valid? No, it was quashed a couple of weeks ago. That's why it's really important just to check on these things, okay? And, of course, Watkins didn't know about that. So what's really important in the domestic situation is that these orders are particularized. This was specifically designed for Steve, for Susan, for the child Davin, and for Del Killingstad. And if a governmental agent doesn't look at the order itself, understand it. Understand, know what prohibits, what it allows, and apply it to a statute, they can't be acting objectively reasonably. And in this case, of course, the marshal said, you need to check on this stuff. Then he clicked, the so-called expert said, you have to check on this stuff. One of the supervisors, O'Donnell, says, I think you've got to look at the statute every time because it's such a convoluted statute that we don't use very often. It sounds like only the lawyer and Mr. Watkins, Officer Watkins, believe that we don't have to check those things out. The response at 35 said, police officers are busy persons. They simply don't have the time to comb through a court file every time they arrest someone for custodial interference. Mr. Watkins says, I don't have time to look through the books. It's up to you lawyers to figure out the little things. That's what he said. I'll touch briefly on Arizona torts. Arizona law is that the probable cause issue goes to the jury when conflicting versions exist for the facts. That's why that should come back to us immediately. And the court views evidence in light most favorable to the verdict. There are no Arizona statutes granting qualified immunity. Devon Peck really doesn't apply in Arizona. But either way, they couldn't meet it because there is no other statute which Steve Killingstad follows. Anyway, I'll reserve the rest. Thank you. Thank you very much, Judge. Mr. Doyle. Thank you, Your Honor. I'm going to please the Court. William Doyle on behalf of the defendant below. Mr. Doyle, if you could bend that microphone stem so it's as close as possible. Is that better? Is that better? Judge Strand, in the post-trial motions, found the existence of probable cause and, in addition, legally determined the existence of qualified immunity on behalf of the officers. On what basis? That was the purpose of my questions to opposing counsel. On what basis did Judge Strand find probable cause? I believe, and it's pretty apparent from the record and based on the Court's rulings, that he found the existence of probable cause based upon a factual determination by the jury as to whether or not the officers involved, particularly Officer Watkins, knew that the final divorce decree and custodial decree had been entered. What's the significance of that? That's why I asked that question. If the officers did not know that the final decree of dissolution had been signed, so it's off the table, right? I think that's right. The significance of the final decree from the defendant's perspective below and, I believe, from Judge Strand's perspective, was that there was no dispute among the parties, that the temporary custody order, which had been entered by Judge Anderson, required an exchange of the child at 4 o'clock on Friday until 4 o'clock on Saturday. I don't think there was any dispute in the trial court that the final order, which was signed at some time on the afternoon of the 4th, which is the day all of this takes place, does not create joint custody, but rather creates primary custody in the plaintiff, Stephen Killingstead. And although the final order may make some arrangements for visitation rights on the part of Susan Killingstead, it was different than the 4 o'clock to 4 o'clock, Friday to Saturday. Okay. So what statute was violated? Well, I think that the ---- And what probable cause to arrest for what violation? Well, I think that the statute was the Arizona 13-0 ---- What subsection? Actually, I think subsection A, Your Honor. And here's why. Would you read that out? Yeah. Let me find it. Okay. So A has four subsections under there. Right. Let's see if I can find it, Your Honor. I'm sorry. Here it is. Subsection A says that 13-0-2-A, a person commits custodial interference if, knowing or having reason to know that the person has no legal right to do so, the person does one of the following. A-3, if the person is one of two persons who have joint legal custody of a child, takes, entices, or withholds from physical custody the child from the other custodian. It is A-3 which makes the factual determination in the interrogatory that was given to the jury critical to the existence of both probable cause and qualified immunity. Why does it? Because ---- If the officer didn't read the temporary order. Well, he did read the temporary order. He may not have read the entire order. Well, that's the key thing. He didn't apparently respond to what was the key part of the order. Not necessarily, Your Honor, because the temporary order essentially provided both of these parents with joint custody. And the temporary order ordered Stephen Killingstead to turn the child over on Friday afternoon. Weren't the order was the joint legal custody part written in the temporary order? It was not, Your Honor. Right. That's the problem. It is only a problem if you consider that two factors. One, that there has to be a specific reference to joint custody. And the Arizona Supreme Court has said the purpose of this statute is you don't interfere with custody, period. Right? Whether or not there's joint custody, primary custody. There's joint legal custody.  It is a term of art. And has been interpreted by the Arizona Supreme Court not just as to joint custody, but as to the interpretation of the entire statute as not withholding custody under any circumstances. So you're saying there's an Arizona case that says there would be probable cause to arrest under 13-1302A3? No, Your Honor. There is a Arizona Supreme Court case in State v. Wood cited in the brief. The site is 198 Arizona 275, in which the Arizona Supreme Court essentially holds that it is a violation of this statute and the intent of this statute to withhold physical custody from the other parent. Well, you have to know that it's wrong to do so, don't you? And these officers did. No, no, no. No, no. The person being arrested has to know he's doing something. There is an intention and knowledge as it's prelude to A. Absolutely. For an ultimate conviction under the statute. But that's not what we're dealing with. We're dealing with whether Officer Watkins had probable cause at the time to believe a violation of the statute had taken place. Not whether, in fact, the violation had occurred. All we care about is what Watkins objectively knew at the time. And here's what he knew. He knew that there was a temporary order in place. He knew that a week before, the plaintiff had withheld the child. He knew that the plaintiff had claimed that there was an abuse charge. He had determined that that was unfounded. He knew that the plaintiff had withheld the child a second week in a row. He knew that the plaintiff claimed not that there was a final order entered, but that there was an abuse charge. Yet at the same time, the plaintiff claimed he had been there at 4 o'clock, not 7 o'clock. But the jury made that determination, so. The jury did make that determination. But they ultimately determined that in the interrogatory that Officer Watkins didn't reasonably know the final order had been entered. And in the absence of the final order, Judge Strand determined, which gets back to your original question. What Judge Strand determined was that if he didn't know the final order had been entered, that he had a reasonable basis to believe the statute had been violated. That doesn't make sense to me. Based on the terms of the temporary order. That doesn't make sense to me, because for two reasons. One, State v. Wood, the case that you cited in support of your argument, deals with 13-1302A2 before the entry of a court order. That does not control the situation where you have a temporary order. The temporary order governs in this case, and Wood doesn't apply here. Wood applies in terms of, although Wood did deal with subsection A2, Wood also states that the overall intent of the statute is to prohibit keeping one child from the other parent. And if what we're talking about is the temporary order here, then the, and if we presume the jury's response to the special interrogatory is appropriately taken, then what we're dealing with is what Officer Watkins knew at the time. And what he knew was there was a temporary order that required the child to be turned over and that the plaintiff hadn't turned the child over. That in and of itself provides probable cause. Well, let me address this a little, because obviously under Davenpick, whatever facts are there will justify him. But I don't think Davenpick dispenses an officer from knowing the law. Now, he's going to be enforcing a temporary order. You say he doesn't have to read it. He can just go out and grab the guy. Is that your position? No, Your Honor, it's not. Well, why didn't he have to read and find out that Dell was the liaison? He had, he did read the order. Well, didn't he know Dell was the liaison? I don't, I frankly don't recall whether. He read it, he knew it. Then he was violating the order. But the order required transfer of the child at 4 o'clock. And that had happened. No, it had. Well, that's a point of view. It had not happened. With all due respect, Judge, they had tried to do it, and they had failed. Well, no one, there was no evidence that Officer Watkins knew that had occurred. No, but there was evidence that if he read the order, he knew that was the, any change had to be done through Dell. That's true. Although, Of course it's true. Although Susan Killenstad told him that it had been changed to 7 o'clock. But the jury didn't, the jury did not believe that version, obviously, or the jury would not have found in favor of Mr. Killenstad. So we're, you know, we're stuck with the jury's determination of the facts. We can't rewrite the facts at this juncture. I agree. Nor are we trying to rewrite the facts. What do you think the jury was thinking? Were they a bunch of idiots? No, I don't think they were a bunch of idiots. What was they thinking? Well, I wasn't in the deliberation journal. Well, they knew the divorce finally occurred. That was irrelevant. No, they didn't. In fact, exactly the opposite. They found there was not known, so they treated it as irrelevant. I don't believe so. And I believe that. Well, how do you know that? Because the intent of submitting the interrogatory was to allow Judge Strand to make a factual determination to decide the case legally, those legal issues which he was entitled and had the right to decide, i.e., probable cause and qualified immunity. And so whether or not the jury took into account the temporary order or the final custody order as it relates to rendering the verdict, they were asked a specific question. Did Officer Watkins know that the final order was? What you're saying is we don't know what basis the jury went on. But one basis they could have gone on was not reading the temporary order. Certainly could have been. All right. Well, that's the jury verdict. Well, it is with the exception of the interrogatory to the jury. Well, then you're saying they should have gone on some other verdict. We have no way of knowing that's what they based their decision on. Well, no, with the exception that they did specifically answer an interrogatory, which said they didn't know. You say nonetheless they decided on that basis. We have no way of knowing they decided on that basis. What? What? I disagree with you. How do we know they decided on the unlawful basis? What's your basis of telling me what the jury decided? They answered the interrogatory that Officer Watkins. No, no. How do we know they decided the case in the plaintiff's favor on that basis? Oh, we have no idea. No idea. Exactly. No idea. No idea. Well, that's in your case. Well, perhaps it is. Well, it is. Except for the fact that you have to come up here and take up our time if you don't have a case. Well, I didn't appeal it, Your Honor. I didn't file an appeal. Well, I didn't take up any court's time. I'd be happy to not be here. Of course you did, because you didn't concede the error. There is no error in the defendant's position. Oh, yeah. There is no error. And if there had been error, there would have been error in not submitting the interrogatory. Once the interrogatory was submitted. It's not an error theory. That's the basis of the court's post-trial motions. It's not a convincing theory. Counsel, my problem is if the district court judge thought this was a matter of law, that the facts were undisputed, why did it go to the jury on the issue of probable cause? Because the court indicated on the record and multiple times since the motion was filed more than once on the issue of probable cause, the court concluded that he needed a factual determination to make that legal determination. Exactly. Right. And so he obtained that factual determination. It was the factual determination that led the court to determine that there was probable cause. Whether or not Officer Watkins reasonably knew that the final decree had been entered. Wrong question. Don't you think that's the wrong question? No, I think it was exactly the correct question. Because if Officer Watkins understood reasonably that the temporary order was in place, then there was probable cause to make the arrest. If Officer Watkins knew the final order had been entered, then there would be no probable cause. But, Counsel, here's the thing, though. That excludes the final dissolution. So the temporary order becomes the operative document, which wasn't read. So how does that establish probable cause if it wasn't read? I don't understand that. It was read, Your Honor. It was read to the point, to the extent that the officer was aware of when the transfer was to take place and that there was an order to make the transfer. Officer Watkins didn't testify that he didn't read the order. He said, I don't have time to read these documents. It's up to the lawyers to do this. In other words, he's like, don't bother me with the details. That's pretty much his attitude on the stand. It was not. That is a mischaracterization of his attitude on the stand. He, in fact, testified that he read the order to the extent that it related to when the transfer was to take place. He acknowledged he did not read the entire order, but he read the portion. It was two pages. He read the portion which allowed him to make a determination as to whether the transfer was to take place. That was what he was concerned with. That is the complaint that had been made to him. And it was made to him a second week in a row. Any other questions? Thank you. Mr. Soniker, you reserved a few minutes. Yes. Thank you. Steve Killingstead was arrested only for conduct that he engaged in on August 4th. That was the undisputed testimony by Officer Watkins. But, you know, in a sense, that doesn't matter if that was the testimony because the Supreme Court. Understood. Has said that if there was an objective basis to arrest him for anything. Sure. He's got probable cause. So that's really what we need to focus on. Right. Objective basis. He believed, Steve Killingstead believed, and there was clear evidence that had the officers done any investigation, any checking, that Steve believed that he had the right to hold on to Davin at 7 p.m. that night. Number one, there was a decree. Whether the police knew about it or not, in Steve's head, he knew there was a decree. Number two, he had complied with the temporary order in every single respect. He was present at 4 p.m. Susan was not present at 4 p.m. He waited around. He went back home. No changes had been made through the court-ordered liaison, Del Killingstead. He knew that. Police, if they would have checked, if they would have considered that there was a liaison, and talked to the guy who was right there when Steve was being put in the car, they would have learned that too. Because, of course, it appears that there was a lot of focus on the existence of a decree. No change through Del. The officers stated they did not read anything other than the exchange time, and even Benny Click said that's the time where you have to exchange it. It's not from that time forward. You can come pick the kid up at any time. We also have the Yavapai County guidelines that presumably those officers ought to know this isn't a solitary case. And we have use it or lose it. Was the July 29 discussion or interchange, July 29, after Susan's first, after her first complaint, then the police said they talked with him? Yes. And was that testimony given to the jury? Yes, indeed it was, and as well it said that she withdrew her complaint. After, on that Saturday, she decided to let it lie until the child was going to meet with a counselor and I think with CPS and other officials at that time. There was a question about the interrogatory, the jury interrogatory. Let me tell you, the way that thing was framed, Steve Killingstead won either way. Because if there's no knowledge of a decree with joint legal custody, he didn't violate, well, if there's no knowledge of it, then it doesn't apply. He was arrested for a crime he didn't commit. If it does apply, even Benny Click said he was in compliance with it, and so either way. Plus, unlike Devenpeck where the officer who originally pulled the guy over knew or believed that the guy was impersonating a cop even though they ended up citing him for something else, we went all through trial and we still didn't know any other possible statute. Benny Click had Exhibit 1 in front of him the whole time, and he said nothing. This came up later as a last-ditch effort to get the money back, to get those verdicts back. That's all I have. Thank you both. Appreciate the excellent argument of both counsel.
judges: Noonan, Gould, Rawlinson